PACIFIC TRIAL ATTORNEYS
A Professional Corporation
Scott J. Ferrell, Bar No. 202091
sferrell@pacifictrialattorneys.com
4100 Newport Place Drive, Ste. 800
Newport Beach, CA 92660
Tel: (949) 706-6464
Fax: (949) 706-6469

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ANNETTE CODY, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>RING LLC, a Delaware limited liability company; and DOES 1 through 25, inclusive,<br><br>Defendant. | Case No. 3:23-cv-00562-AMO<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT ("CIPA")**<br><br>Filed: February 8, 2023 |

## INTRODUCTION

**Defendant Ring LLC ("Defendant") secretly enables and allows a third-party spyware company to eavesdrop on the private conversations of everyone who communicates through the chat feature at www.ring.com (the "Website"). The spyware company then exploits and monetizes that data by sharing it with other third parties, who use the private chat data to bombard the unsuspecting visitor with targeted marketing.**

**Defendant does this without visitors' informed consent. As a result, Defendant has violated the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 630, *et seq*.**

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is at least minimal diversity because at least one Plaintiff and Defendant are citizens of different states. Indeed, based upon the information available to Plaintiff, there are believed to be at least 5,000 class members, each entitled to $5,000 in statutory damages, thus making the amount in controversy at least $25,000,0000 exclusive of interests and costs. Cal. Penal Code § 637.2(a)(1).

2. Pursuant to 28 U.S.C. § 1391, venue is proper because a substantial part of the acts and events giving rise to the claims occurred in this District.

3. Defendant is subject to personal jurisdiction because it has sufficient minimum contacts with California, and it does business with California residents.

## PARTIES

4. Plaintiff Annette Cody ("Plaintiff") is a resident and citizen of California. In September 2022, while physically within California, Plaintiff visited Defendant's Website using a smart phone and conducted a brief conversation with a customer

service representative of Defendant through the Website chat feature related to Defendant's products offered on the Website. Plaintiff was not advised that the chat was monitored, intercepted, or recorded.

5. Defendant is an American manufacturing company headquartered in Santa Monica, California and incorporated in Delaware. Defendant sells outdoor surveillance cameras, including the Ring Video Doorbell smart doorbell, and hosts an app, Neighbors, for online social sharing of captured footage among users. With annual sales in the hundreds of millions of dollars, it is one of America's largest home products companies.

6. Defendant owns, operates, and/or controls the Website.

## FACTUAL ALLEGATIONS

7. CIPA prohibits both the wiretapping of and eavesdropping upon electronic communications without the consent of all parties to the communication. Compliance with CIPA is easy, and most website operators comply by conspicuously warning visitors that their conversations are being recorded, intercepted, and/or eavesdropped upon.[1]

8. Unlike most companies, Defendant *ignores* CIPA. Instead, Defendant enables and allows an independent third party to eavesdrop upon and record all such conversations. Why? Because, as one industry expert notes, "*Live chat transcripts are the gold mines of customer service. At your fingertips, you have valuable customer insight to make informed business decisions…. **When people are chatting, you have direct access to their exact pain points.***"). *See* https://www.ravience.co/post/improve-marketing-roi-live-chat-transcripts (last visited April 2023) (emphasis added).

9. Defendant's actions are not incidental to facilitating e-commerce, nor are they undertaken in the ordinary course of business. To the contrary, as noted above,

---

1 https://www.leechtishman.com/insights/blog/the-california-invasion-of-privacy-act-californias-wiretap-act/ ("*CIPA Compliance is not difficult. A business must take certain steps. . .with a chat feature. . .to ensure that it obtains valid consent consistent with the holdings of courts interpreting CIPA.*") (last visited April 2023) (emphasis added).

Defendant's actions violate industry norms and the legitimate expectations of consumers.

10. To enable the eavesdropping, Defendant has allowed a third party – believed to be Kustomer, Inc., a subsidiary of Meta, Inc. (hereinafter referred to as the "Third-Party Spyware Company") – to secretly intercept, exploit, and monetize the chat conversations between Defendant and visitors to its Website.

11. The Third-Party Spyware Company's chat service is an Application Programming Interface that is "plugged into" Defendant's Website. The chat function is run from the Third-Party Spyware Company's own servers, but customers interact with the chat service on Defendant's Website so it appears to users that they are communicating with a company representative of Defendant.

12. This ability to disguise the chat service behind Defendant's own brand is a "feature" that the Third-Party Spyware Company specifically advertises to companies like Defendant, while clarifying that its "Kustomer Chat" product remains just that: the Third-Party Spyware Company's own—even as it collects data on its clients' customers. As the Third-Party Spyware Company advertises, its clients, like Defendant, are able to "[c]ustomize chat for [their] brand and tailor the Chat Conversational Assistant to speed up response and resolution times by collecting basic customer information for your agents and then auto-routing conversations." *See* https://www.kustomer.com/product/ (last visited March 25, 2024).

13. The Third-Party Spyware Company also markets that its clients, like Defendant, can leverage its extensive "knowledge base," customizing it for their brand or brands. *Id.*

14. Additionally, in marketing materials in which the Third-Party Spyware Company compares itself against industry competitors, it boasts its partnership with other third parties, advertising that clients like Defendant can "[a]ccess a complete suite of turnkey tools for channel setup, meticulous branding, rule management, and seamless integration with third-party solutions." https://www.kustomer.com/compare/zendesk/

(last visited March 25, 2024).

15. The Third-Party Spyware Company also advertises that it offers "omnichannel" support—meaning that clients, like Defendant, can use its spyware "seamlessly across all digital channels" to "meet customers wherever their digital interactions take them." *Id.*

16. In other words, the Third-Party Spyware Company specifically advertises that its shares customer information with third-party applications, such as Facebook.

17. Indeed, the Third-Party Spyware Company specifically integrates with Facebook, leveraging information shared with it about customers via any other platform to "activate social listening to fuel social commerce." https://www.kustomer.com/product/integrations/facebook-messenger/ (last visited March 25, 2024).

18. Additionally, the Third-Party Spyware Company has a growing list of other third-party software company "partners," all of whom it integrates with.

19. This means that information about customers is both shared to and gathered from Facebook (and other third-party partners), which the Third-Party Spyware Company promises gives its chatbots the ability "to deliver personalized experience to every customer." *Id.*

20. Thus, whenever a chat message is sent from a member of the Class to Defendant, it is first routed through the Third-Party Spyware Company's server. This enables the Third-Party Spyware Company to analyze and collect customer-support agent interactions in real time to create live transcripts of communications as they occur, among other services. Indeed, the Third-Party Spyware Company confirms it provides real-time team messaging. *See* https://www.kustomer.com/webinars/modern-omnichannel-operations/ ttps://www.8x8.com/products/team-chat (last downloaded April 2023) (referencing real-time messaging capabilities). Defendant neither informs visitors of this conduct nor obtains their consent to these intrusions.

21. Indeed, the Third-Party Spyware Company even specifically warns its

clients, like Defendant, in its frequently asked questions that it cannot track information that Defendant gathers using its own systems; rather, that it ***directly captures such messages itself***: "Kustomer can only capture and record outbound messages sent from within the Kustomer platform. If you use the Facebook Messenger app to reply to a customer, Kustomer cannot capture that message in the timeline." https://help.kustomer.com/en_us/facebook-By0KJrBIZ (last visited March 25, 2024). In other words, Kustomer is clear that it must be the one to gather consumer data in order for its clients to utilize its services.

22. In other words, the Meta subsidiary[2] Third-Party Spyware Company records consumer data in real-time via its integrated, branded chat tool, in which it pretends to be Defendant's own chat feature. Then, it shares this information with Meta to facilitate "Facebook integration."

23. One might reasonably wonder why the Third-Party Spyware Company would be interested in intercepting and recording the website chat interactions between Defendant and unsuspecting visitors to Defendant's Website. As shown below, it is all about money.

24. The Third-Party Spyware Company is a subsidiary of Meta, Inc. Indeed, according to Bloomberg.com, Meta acquired the Spyware Company as part of Meta's secret "***plan to profit from private chats.***" *See* https://www.bloomberg.com/news/articles/2022-02-15/meta-closes-1-billion-kustomer-deal-after-regulatory-review (last downloaded April 2023) (emphasis added).

25. So how does it work? ***First***, Meta identifies "user interests" by monitoring a collection of "offsite" user activity, such as the purportedly private chat communications between Defendant and visitors to its Website by "integrating" with the Third-Party Spyware Company's software. ***Second***, Meta generates revenue by selling advertising space through its subsidiaries' ability to identify those offsite user interests. ***Third and finally***, after harvesting the chat transcripts for valuable data,

[2] Kustomer is no longer a Meta subsidiary, but was at all times relevant to this Action.

Meta's brands bombard the unsuspecting Website visitors with targeted advertising.

26. Through the preceding acts, the Third-Party Spyware Company can freely boast that it will "Transform your support center into a profit generator." *See* https://www.kustomer.com/product/customer-service/ (last downloaded April 2023).

27. Indeed, all of the schemers – Defendant, the Third-Party Spyware Company, and its parent Meta – profit from secretly exploiting the private chat data through targeted social media advertising because "*Targeted advertising allows brands to send different messaging to different consumers based on what the brand knows about the customer. The better a brand can demonstrate that it understands what its customers want and need, the more likely customers respond to advertising and engage with the brand. Social media targeting helps brands leverage consumers' behavior on the web, search engines, and social media sites to present ads that reflect consumer interests.*"[3]

28. Defendant was aware of and aided in this scheme because Defendant allowed the Third-Party Spyware Company to brand its chat feature, knowing that this would mislead consumers, who would not realize their data was being captured and recorded by a third-party, Meta-owned subsidiary.

29. Defendant was additionally aware of this scheme because, upon information and belief, Defendant knew of the marketing campaigns that specifically set the Third-Party Spyware Company apart from its competitors ***on the specific basis*** of its integrations with Facebook and other third parties, which allowed the Third-Party Spyware Company to harvest data from chat conversations on Defendant's Website for use on Facebook.

30. The Third-Party Spyware Company's exploitation, monetization, use of, and interaction with the data it gathers through the chat feature in real time makes it more than a mere "extension" of Defendant.

[3] *See* https://www.adroll.com/blog/what-is-targeted-advertising#:~:text=Targeted%20advertising%20allows%20brands%20to,and%20engage%20with%20the%20brand (last visited March 2023) (emphasis added).

31. Indeed, Defendant recently updated its online privacy policy to ***admit*** that it does ***exactly*** what Plaintiff alleges herein. *See* https://ring.com/privacy-notice ("*We use third-party web and app analytics services on our websites and mobile apps. The service providers use automated technologies to collect and analyze information, including personal information (such as email and IP addresses) to understand how you use our websites and mobile apps. Web and app analytics services help us improve features, evaluate the effectiveness of our marketing, and, ultimately, optimize the customer experience.)* (last downloaded April 2023) (emphasis added).

32. Given the nature of Defendant's business, any information that visitors share is by its nature personal, confidential, and personally identifying information data.

33. In September 2022, Plaintiff visited Defendant's Website and had a brief conversation through the chat feature with a customer representative of Defendant. Plaintiff used a smart phone (a cellular telephone with integrated computers to enable web browsing). As such, Plaintiff's conversations with Defendant were transmitted from "cellular radio telephones" and/or "landline telephones."

34. By definition, Defendant's chat communications from its Website are transmitted to visitors by either cellular telephony or landline telephony. *See* https://www.britannica.com/technology/Internet ("How does the Internet work?") ("*The Internet works through a series of networks that connect devices around the world through telephone lines.*") (last visited March 2023).

35. Defendant did not inform Class members that Defendant was secretly allowing, aiding, and abetting the Third-Party Spyware Company to intercept and eavesdrop on the conversations during transmission, and then exploit the data for their mutual gain.

36. Defendant did not obtain Plaintiff's or the Class members' express or implied consent for the preceding intrusions, nor did Plaintiff or Class members know at the time of the conversations of Defendant's conduct.

///

**CLASS ALLEGATIONS**

37. Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class") defined as follows:

> **All persons within the United States who, during the statute of limitations period: (1) communicated with Defendant via the chat feature on Defendant's Website; and (2) whose communications were recorded and/or eavesdropped upon without prior consent.**

38. NUMEROSITY: Plaintiff does not know the number of Class members but believes the number to be in the thousands, if not more. The exact identities of Class members may be ascertained by the records maintained by Defendant.

39. COMMONALITY: Common questions of fact and law exist as to all Class members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class member, include but are not limited to the following:

a. Whether Defendant aided and abetted a third party in eavesdropping upon and recording communications;

b. Whether Plaintiff and Class members are entitled to statutory penalties; and

c. Whether Class members are entitled to injunctive relief.

40. TYPICALITY: As a person who visited Defendant's Website and whose electronic communication was recorded, intercepted and eavesdropped upon, Plaintiff is asserting claims that are typical of the Class.

41. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in the class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

42. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class members is impracticable and inefficient. Even if every Class member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.

**FIRST CAUSE OF ACTION**

**Violations of the California Invasion of Privacy Act**

**Cal. Penal Code § 631(a)**

43. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

44. Section 631(a) of California's Penal Code imposes liability upon any entity that "by means of any machine, instrument, contrivance, or in any other manner," (1) "intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system," or (2) "willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state" or (3) "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

45. Section 631 of the California Penal Code applies to internet communications and thus applies to Plaintiff's and the Class's electronic communications with Defendant's Website. "Though written in terms of wiretapping, Section 631(a) applies to Internet communications. It makes liable anyone who 'reads,

or attempts to read, or to learn the contents' of a communication 'without the consent of all parties to the communication.'" *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. 2022).

46. The Third-Party Spyware Company's software embedded on Defendant's Website to record and eavesdrop upon the Class's communications qualifies as a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct alleged herein.

47. At all relevant times, Defendant intentionally caused the internet communication between Plaintiff and Class Members with Defendant's Website to be recorded. Defendant also aided and abetted, agreed with, employed, or conspired with at least one third party to wiretap and/or eavesdrop upon such conversations during transmission and in real time by voluntarily embedding the software code for Third-Party Spyware Company's software on Defendant's Website, and, additionally, by branding the Third-Party Spyware Company's software to mimic software authored by Defendant, so consumers would not realize they were interacting with a third-party software service that was recording their chat conversations in real-time.

48. Defendant knows that Third-Party Software Company, through software, captures the electronic communications of visitors to Defendant's Website, and pays Third-Party Software Company to conduct these activities.

49. Defendant knows that the Third-Party Software Company shares consumer information with Meta, along with other "partners," which in turn allows Meta to bombard consumers with targeted advertisements based on their conversations on Defendant's Website.

50. Plaintiff and Class Members did not expressly or impliedly consent to any of Defendant's actions.

51. In a materially identical case, a court recently held that the above-described allegations state viable claims for violations of section 631(a) of CIPA. *See Byars v. The Goodyear Tire & Rubber Co.*, No. 5:22-cv-01358-SSS-KKx, 2023 WL 1788553,

*4 (C.D. Cal. Feb. 3, 2023) (Sykes, J.) ("*Byars contends that Goodyear, using a third-party service, "intercepts in real time" a website visitors' chat conversation. Byars alleges that, using the chat conversation, website visitors share sensitive personal information. Because Byars has pled sufficient facts to show the contents of the communications and that the communications were intercepted, Byars has sufficiently stated a claim under § 631(a).*") (emphasis added).

52. Defendant's conduct constitutes numerous independent and discreet violations of Cal. Penal Code § 631(a), entitling Plaintiff and Class Members to injunctive relief and statutory damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief against Defendant:

1. An order certifying the Class, naming Plaintiff as the representative of the Class and Plaintiff's attorneys as Class counsel;
2. An order declaring Defendant's conduct violates CIPA;
3. An order of judgment in favor of Plaintiff and the Class and against Defendant on the causes of action asserted herein;
4. An order enjoining Defendant's conduct as alleged herein and any other injunctive relief that the Court finds proper;
5. Statutory damages pursuant to CIPA;
6. Reasonable attorneys' fees and costs; and
7. All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

Dated: March 25, 2024

PACIFIC TRIAL ATTORNEYS, APC

By: */s/ Scott J. Ferrell*
Scott. J. Ferrell
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on March 25, 2024, I electronically filed the foregoing **SECOND AMENDED CLASS ACTION COMPLAINT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing via electronic mail to all counsel of record.

*/s/ Scott J. Ferrell*
Scott J. Ferrell